CUI

# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40386**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Daniel R. CSITI**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 29 April 2024

———————————

*Military Judge*: Colin P. Eichenberger.

*Sentence*: Sentence adjudged 27 July 2022 by GCM convened at Malmstrom Air Force Base, Montana. Sentence entered by military judge on 23 August 2022: Dishonorable discharge, confinement for 2 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Megan R. Crouch, USAF; Major Eshawn R. Rawlley, USAF.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Colonel Steven R. Kaufman, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, RICHARDSON, and WARREN, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge WARREN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone found Appellant guilty, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for two years, total forfeiture of pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises three issues on appeal: (1) whether Appellant's conviction is legally and factually sufficient; (2) whether the military judge abused his discretion by denying the Defense's motion to dismiss for defective preferral of charges and a defective preliminary hearing; and (3) whether Appellant is entitled to relief due to prosecutorial misconduct. We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND[3]

AH arrived at Malmstrom Air Force Base (AFB), Montana, in April 2017.[4] Appellant was a member of AH's squadron and was assigned to train AH on her duties. As time passed, Appellant and AH became close friends who spent an increasing amount of time together off-duty, to the point that AH considered Appellant her "best friend." However, they did not have a sexual or romantic relationship.

AH was married and became pregnant while she was stationed at Malmstrom AFB; however, the marriage did not last. According to AH's testimony, her ex-husband "left" during her pregnancy and at some point they were divorced. During AH's pregnancy, Appellant "ended up being a very good emotional support person" for AH, and also provided financial support by "helping [her] buy things for [her] son because [AH's ex-husband] at the time wasn't helping out." At one point in AH's pregnancy, Appellant told AH he "had feelings for" her and "wanted something more," but she "rejected" him and told

---

[1] Unless otherwise indicated, all references to the UCMJ and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The military judge found Appellant not guilty of two specifications of abusive sexual contact in violation of Article 120, UCMJ.

[3] The following background is drawn primarily from AH's trial testimony, supplemented by other evidence from the record of trial.

[4] AH was an active duty Air Force member at all times relevant to this opinion.

him "it wasn't going to happen." Following this rejection, Appellant and AH stopped talking to each other for approximately two months.

Appellant and AH subsequently reconciled and resumed their close platonic friendship. Appellant frequently babysat AH's child and provided other support for AH, and he often spent the night at her house. Appellant and AH also frequently socialized with other friends.

AH regularly became intoxicated from drinking alcohol. On multiple occasions, AH consumed alcohol such that portions of her memory were "blacked out," and she could not recall certain conversations and other activities she engaged in.

In May 2021, AH was in a relationship with Staff Sergeant (SSgt) KI. On 21 May 2021, AH made plans to go out to dinner with two other friends, AS and SSgt NA. Appellant agreed to come to AH's on-base house and watch her son for the evening. Before she drove to the restaurant, AH drank some "homemade mead,"[5] but "[n]ot that much." At the restaurant, AH began drinking wine. She ate pizza at the restaurant, but vomited until her stomach was empty, and then drank two or three more glasses of wine by her estimate. By the end of the dinner AH felt "[t]oo intoxicated to drive on her own." At trial, SSgt NA testified he estimated AH drank three or four glasses of wine at the restaurant and became "[t]ipsy," "laughing and giggling" and "swaying" as she walked, but "coherent."

SSgt NA drove AH home in his car. When they arrived, Appellant came out to the car to help bring AH into the house. AH testified she did not remember getting out of SSgt NA's car, but she remembered being in her kitchen talking to Appellant. She began drinking alcoholic hard seltzer, although she could not remember how much. Appellant later told her she drank between three and five cans of it.

AH's next memory was of waking up in the morning on her bed in her upstairs bedroom. There were no sheets on the bed, which was unusual as she normally would make her bed after washing the sheets, and she was completely naked, which was also unusual as she normally slept with clothes on. In addition, she felt "sore around [her] vaginal area." After AH got dressed and left her bedroom, she found her son was asleep in his room and Appellant was sleeping downstairs. Appellant's presence was not surprising because he had spent the night at her house before. AH and Appellant spent much of that day

---

[5] AH explained Appellant "used to make mead" and would "bring some over on occasion."

together. Appellant seemed "a little bit more quiet than usual," but that did not raise any "red flags" for AH at the time.

A week later, AH invited Appellant to have dinner at her house. That night Appellant told AH he performed oral sex on AH during the portion of the night of 21–22 May 2021 that AH could not remember. AH recorded part of their conversation on her phone. Appellant told AH they had talked for a while until AH went upstairs to go to bed. However, AH later came back downstairs and resumed talking with Appellant. At one point while they were talking, AH fell over in the chair on which she was sitting, with the chair making a dent in the wall. According to Appellant, at one point AH complained about her body, to which Appellant responded that he thought she had a perfect body, or words to that effect. AH then said to Appellant, "show me," and removed her pants and underwear. Appellant performed oral sex on AH for approximately a minute, after which AH pushed Appellant away with her leg and said she had to urinate. Appellant helped AH put her underwear back on, after which AH said she did not have to urinate but she was tired, and she lay down to sleep on the sofa. Appellant then lay down on the floor nearby, but later moved to a couch in another room to sleep.

Appellant's admissions "shocked" AH because she had told Appellant that she was not attracted to him, she would not have agreed to such activity, she trusted Appellant, and she had no suspicion during the preceding week that any sexual activity had occurred between them. AH reported the incident to the Air Force Office of Special Investigations (OSI) the following day. At the OSI's request, AH recorded another conversation with Appellant at her house using a device the OSI provided. During this conversation, Appellant repeated a substantially similar version of events as in the prior conversation AH had recorded, but with additional details. Appellant stated he helped AH go upstairs when she initially went to her bedroom after they spoke in the kitchen. Appellant told AH one of the things they talked about, after she came back downstairs, was how AH's relationship with SSgt KI was not going well at that time. Appellant again described how AH fell over in her chair, after which he "carried" her. Appellant said AH was drunk and agreed she was "f[**]ked up." Appellant said after AH removed her pants and underwear they kissed before he performed oral sex. Appellant denied that he penetrated her with his penis or ejaculated. On the recording, Appellant apologized to AH for what he had done. As part of his apology, he told her, "And that's where it was my fault for not telling myself, 'No,' and to just back away from it instead." He further told her, "However you deemed it to be. If you were to make a phone call or something, I did what I did."

At trial, the Defense called Dr. EB, who the military judge recognized as an expert in forensic psychology. Dr. EB testified about memory and the effects

of alcohol on the brain. She explained, *inter alia*, that alcohol "reduces inhibition so that we act more on our impulses," and that regular heavy drinking "increases a person's tolerance so they could consume greater and greater amounts of alcohol without showing functional impairments." Dr. EB also explained the phenomenon of alcohol-induced blackout, which she described as "where a person is awake, engaged, behaving, but not recording memory." She testified the fact that a person experiences a blackout does not directly indicate how impaired the person is due to alcohol. Dr. EB explained blackout "is related to the speed of the rise" in one's blood alcohol level, rather than how high one's blood alcohol level is, such that a blackout can occur "at different points along th[e] progression of intoxication." According to Dr. EB, someone in a blackout may still be capable of complex activities and making decisions.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal sufficiency de novo. *United States v. Harrington*, 83 M.J. 408, 414 (C.A.A.F. 2023) (citing *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *King*, 78 M.J. at 221 (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

Historically, the Courts of Criminal Appeals (CCAs) have also conducted a de novo review of the factual sufficiency of the evidence. *See United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). The long-standing test for factual sufficiency, rooted in the prior versions of Articles 66(c) and (d), UCMJ, 10 U.S.C. §§ 866(c), (d), required the CCAs to "take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of

innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018) (applying the version of Article 66(c), UCMJ, in effect prior to 2019); *see also United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *Wheeler* and applying the same factual sufficiency test in the context of Article 66(d), UCMJ, effective 1 January 2019).

However, the National Defense Authorization Act for Fiscal Year 2021 amended Article 66, UCMJ, to modify our factual sufficiency review as follows:

> (B) FACTUAL SUFFICIENCY REVIEW.
>
> > (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
> >
> > (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
> >
> > > (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
> > >
> > > (II) appropriate deference to findings of fact entered into the record by the military judge.
> >
> > (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (*Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). The new factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3611. This court has not yet had occasion to analyze the new statutory standard for factual sufficiency. However, two of our sister courts issued published opinions addressing the new standard. *See United States v. Scott*, 83 M.J. 778, 779–80 (A. Ct. Crim. App. 2023), *rev'd on other grounds*, ___ M.J. ___, No. 24-0063/AR, 2024 CAAF LEXIS 68 (C.A.A.F. 1 Feb. 2024); *United States v. Harvey*, 83 M.J. 685, 690–94 (N.M. Ct. Crim. App. 2023), *rev. granted*, ___ M.J. ___, No. 23-0239/NA, 2024 CAAF LEXIS 13 (C.A.A.F. 10 Jan. 2024). Those CCAs agreed the new statute made it more difficult than previously for an appellant to secure relief on appeal for factual insufficiency, but *Scott* disagreed with

*Harvey*'s proposition that "Congress has implicitly created a rebuttable presumption that in reviewing a conviction, a [C]ourt of [C]riminal [A]ppeals presumes that an appellant is, in fact, guilty." *Harvey*, 83 M.J. at 693; *see Scott*, 83 M.J. at 780.

"In the absence of a statutory definition, the plain language of a statute will control unless it is ambiguous or leads to an absurd result." *United States v. Cabuhat*, 83 M.J. 755, 765 (A.F. Ct. Crim. App. 2023) (en banc) (citing *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007)). Inquiry into the plainness or ambiguity of a statute's meaning "must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)); *see also Cabuhat*, 83 M.J. at 766 (quoting *Robinson*). By contrast, when the text is ambiguous, reviewing courts may apply the statutory canons of construction to resolve those ambiguities. *See Cabuhat*, 83 M.J. at 765–66 (citing *Robinson*, 519 U.S. at 340). In construing amended legislation, two canons of construction are particularly applicable. First, we "assume that Congress is aware of existing law when it passes legislation." *United States v. McDonald*, 78 M.J. 376, 380 (quoting *Miles v. Apex Marine Corps*, 498 U.S. 19, 32 (1990)). Second, "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. Immigration and Naturalization Service*, 514 U.S. 386, 397 (1995) (quoted with approval in *United States v. Matthews*, 68 M.J. 29, 37 (C.A.A.F. 2009)).

In order to convict Appellant of sexual assault as charged in this case, the Government was required to prove that at or near Malmstrom AFB, on or about 21 May 2021: (1) Appellant committed a sexual act upon AH, specifically by causing contact between his mouth and her vulva; (2) AH was incapable of consenting to the sexual act due to impairment by alcohol; and (3) Appellant knew or reasonably should have known AH was so impaired. *See* 10 U.S.C. § 920(b)(3)(A); *Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 60.b.(2)(f). The term "[s]exual act" includes, *inter alia*, "contact between the mouth and the . . . vulva." 10 U.S.C. § 920(g)(1)(B). "The term 'incapable of consenting' means the person is[ ] (A) incapable of appraising the nature of the conduct at issue; or (B) physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue." 10 U.S.C. § 920(g)(8); *see also United States v. Pease*, 75 M.J. 180, 184–86 (C.A.A.F. 2016) (explaining the definition of "incapable of consenting" under the prior version of Article 120, UCMJ, in terms substantially similar to the current statutory definition).

### 2. Analysis

#### a. Legal Sufficiency

The Government introduced sufficient evidence of Appellant's guilt to meet the "very low threshold" for legal sufficiency. *King*, 78 M.J. at 221. Although there was no physical evidence of the sexual act and AH could not remember it, the Government introduced audio recordings of Appellant twice admitting he performed oral sex on AH after her pants and underwear were removed. A rational finder of fact could reasonably interpret Appellant's statements to mean he placed his mouth on AH's vulva.

Although the Government could not prove AH's blood-alcohol level, it introduced evidence AH consumed a large amount of alcohol on the night in question. The evidence indicated AH consumed some amount of homemade mead, approximately three or four glasses of wine, and some unknown amount of hard seltzer that Appellant later told AH was between three and five cans. Although AH regularly drank alcohol, the record also reflects her body size was relatively small; a rational factfinder applying common sense and knowledgeable of the ways of the world could conclude AH's size rendered her more susceptible to the effects of a given quantity of alcohol than a larger person would have been.

Additional evidence tended to indicate AH was significantly impaired by alcohol, and Appellant knew it or should reasonably have known it. A rational factfinder could conclude Appellant knew AH was too drunk to drive home from the restaurant because SSgt NA drove her home, and Appellant helped AH get inside the house. Appellant then observed AH continue to drink alcohol. He also stated he "helped" her go up the stairs to her bedroom before she came back down. Appellant also told AH that at one point as they were talking, AH fell over in her chair causing the chair to dent the wall; OSI agents found such a dent in the wall and bits of paint on the edge of a chair when they inspected AH's house. Appellant told AH that after she fell over, he "carried" her, presumably to the sofa, before the sexual act occurred. Appellant agreed that AH was drunk and "f[**]ked up" at that point.

We recognize Appellant's version of events, if entirely true, suggests AH was not so impaired by alcohol that she was incapable of consenting. According to Appellant, immediately prior to the sexual act AH was still holding a conversation with him; she removed her own pants and underwear; and after approximately a minute of oral sex she pushed Appellant away with her leg and told him she needed to urinate. These actions, if true, suggest AH was able to appreciate the nature of the sexual act and that AH was capable of declining participation.

However, the trier of fact could properly believe one part of Appellant's statement while disbelieving another part. *Cf. United States v. Nicola*, 78 M.J. 223, 227–28 (C.A.A.F. 2019) ("[T]he trier of fact may disbelieve the accused's testimony and then use the accused's statements as substantive evidence of guilt . . . ." (Citation omitted)); *United States v. Bare*, 63 M.J. 707, 713 (A.F. Ct. Crim. App. 2006) ("Court members may believe one portion of a witness's testimony but disbelieve others." (Citation omitted)). Appellant's version of events failed to explain certain other evidence, including AH awakening naked on a sheetless bed upstairs "sore around [her] vaginal area," rather than sleeping clothed on the downstairs sofa where Appellant purportedly left her—creating a reasonable inference Appellant was being less than entirely candid about what had happened.

Moreover, the trier of fact could reasonably interpret other evidence as indicating AH would not have consented or behaved in the manner Appellant claimed. AH testified she had previously flatly rejected Appellant when he expressed a desire for a more intimate relationship. AH reacted with shock and anger when Appellant told her he had performed oral sex on her. At trial, she testified that she—drunk or sober—would never have allowed Appellant to kiss her or allowed him to perform oral sex on her on 21 May 2021. A rational factfinder could have credited AH's testimony and found it implausible that she removed her pants and underwear and consensually engaged in such behavior with Appellant—*i.e.*, that the exculpatory aspects of Appellant's account were true. Such a rational factfinder could attribute Appellant's implausible account to consciousness of guilt, and could also consider his somewhat incriminating statements to the effect that he knew he should have just "back[ed] away," that he "did what [he] did," and he would understand if AH were to "make a phone call" and report him. A rational trier of fact could find these statements suggest that, at the time, Appellant knew what he did was wrong, knew AH would not actually consent to sexual activity with him, and knew he had taken advantage of her incapacitation by alcohol.

Therefore, viewing the evidence in the light most favorable to the Government, a rational trier of fact could find the elements of the offense proven beyond a reasonable doubt.

### b. Factual Sufficiency

Although the question is a close one, applying the new statutory standard, we also find the evidence factually sufficient to sustain Appellant's conviction.

### i) Specific showing of a deficiency of proof

In contrast to earlier versions of Article 66, UCMJ, which required this court to assess the factual sufficiency of the evidence in every case, *see Washington*, 57 M.J. at 399, under the current version of Article 66(d)(1)(B), UCMJ

(2024 *MCM*), the initial question is whether Appellant has requested factual sufficiency review and has made "a specific showing of a deficiency of proof." We agree with our Navy-Marine Corps counterparts that this provision does not require Appellant to demonstrate the entire absence of evidence supporting an element of the offense, a requirement which would be redundant with legal sufficiency review. *See Harvey*, 83 M.J. at 691. Rather, the statute requires Appellant "identify a weakness in the evidence admitted at trial to support an element (or more than one element) and explain why, on balance, the evidence (or lack thereof) admitted at trial contradicts a guilty finding." *Id.*

Appellant has made the requisite showing of a deficiency of proof. Among other points, Appellant contends that the version of events he related in the two recorded conversations indicate AH was not incapable of consenting to sexual activity, and even if she was incapable, the evidence does not prove Appellant knew or reasonably should have known she was incapable of consenting. If either contention were true, Appellant would not be guilty of the sexual assault specification for which he was convicted.

We note that once an appellant makes the requisite showing, the statute provides we "*may* consider whether the finding is correct in fact." 10 U.S.C. § 866(d)(1)(B)(i) (2024 *MCM*) (emphasis added). We note the permissive term "may," on its face, might be read to indicate that progressing further with factual sufficiency analysis is not required, but rather up to the discretion of the CCA. The term might also be read to simply signal that once an appellant has satisfied the initial specific showing required by 10 U.S.C. § 866(d)(1)(B)(i) (2024 *MCM*), the CCA is then empowered to conduct the factual sufficiency review without implying the CCA has discretion not to do so. We leave for another day the question of whether a CCA might properly decline to proceed further with factual sufficiency analysis at this stage; in Appellant's case, we have proceeded with the analysis. *Cf. Scott*, 83 M.J. at 780 ("Once appellant makes a specific showing of a deficiency in proof, we *will* conduct a de novo review of the controverted questions of fact.") (Emphasis added).).

### ii) Weighing the evidence and determining controverted questions of fact

When weighing the evidence and determining controverted questions of fact, Article 66(d)(1)(B)(ii), UCMJ (2024 *MCM*), requires that we afford "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence." This is a change from the prior version of Article 66(d)(1), UCMJ, which required CCAs to "recogniz[e] that the trial court saw and heard the witnesses." 10 U.S.C. § 866(d)(1). The current statute does not specify what is meant by the term "appropriate deference." Our Navy-Marine Corps counterparts concluded that "appropriate deference" is a more deferential standard than "recognizing," but not one which deprives the CCA of the power to

determine the credibility of witnesses. *Harvey*, 83 M.J. at 692. We broadly agree, with the additional observation that the significance of the credibility of particular witnesses or testimony will vary depending on the circumstances of the case.

Accordingly, we have given appropriate deference to the fact that the military judge saw and heard the witness testimony and other evidence. We appreciate that in a case such as the instant one, where the victim cannot remember the charged offense, the victim's credibility is arguably less vital than in a case where the victim was the key witness to the offense itself or where her testimony was in substantial conflict with other evidence. We also appreciate that the critical proof of the charged sexual act in this case comes from audio recordings that are contained in the record of trial, and therefore available to us in the same form in which they were provided to the military judge. Nevertheless, affording appropriate deference to the military judge, in light of the findings, we presume AH generally—to the extent not contradicted by the record[6]—testified credibly with respect to the convicted sexual assault, including her shock at what Appellant admitted doing to her and her certainty that she would not have consensually engaged in sexual activity with Appellant.

### iii) "Clearly convinced that the finding of guilty was against the weight of the evidence"

Having weighed the evidence, the ultimate statutory test for factual insufficiency is whether we are "clearly convinced that the finding of guilty was against the weight of the evidence." 10 U.S.C. § 866(d)(1)(B)(iii) (2024 *MCM*). We agree with our CCA counterparts to the extent that Congress intended this new statutory standard to "make[ ] it more difficult for [an appellant] to prevail on appeal." *Scott*, 83 M.J. 780; *see also Harvey*, 83 M.J. at 693 ("[T]his [c]ourt will weigh the evidence in a deferential manner to the result at trial."). However, like our Army counterparts, we decline to apply *Harvey*'s "rebuttable presumption . . . that an appellant is, in fact, guilty." 83 M.J. at 693; *see Scott*, 83 M.J. at 780 (quoting and disagreeing with *Harvey*).

---

[6] For example, we recognize that after the Government rested, AH's Special Victims' Counsel (SVC) alerted the military judge and parties to an issue with AH's testimony. The Defense subsequently called AH as a witness. AH admitted that during her initial testimony, in response to a question from the military judge, she had falsely claimed she did not remember what happened after she awakened Appellant on the morning of 22 May 2021. AH explained she did so because she "did not want to get in trouble" because Appellant had driven her to the restaurant that morning to pick up her car, and her child had been in the house alone. After her testimony, AH informed her SVC of what she had done, leading to the disclosure and her subsequent additional testimony.

The statute does not further define what Congress meant by the terms "clearly convinced" and "against the weight of the evidence" in this context. We note Congress did not expressly refer to either the clear and convincing evidence standard, nor the preponderance of the evidence standard. In general, a finding of guilty would be against the weight of the evidence if the legal and competent evidence admitted at trial failed to establish the accused's guilt beyond a reasonable doubt. *See* 10 U.S.C. § 851(c)(1) (setting forth required court member instructions as to the burden of proof); Rule for Courts-Martial (R.C.M.) 920(e)(5) (same). This familiar standard of proof has long been applied to questions of legal and factual sufficiency of the evidence under Article 66, UCMJ. *See United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) ("For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt."); *see also Washington*, 57 M.J. at 399 (citing *Turner*, 25 M.J. at 325); *United States v. Sills*, 56 M.J. 239, 240–41 (C.A.A.F. 2002) (declining to find references to "weight of the evidence" in the legislative history of the UCMJ evinced congressional intent that factual sufficiency review apply less than the "traditional criminal law standard" of proof beyond a reasonable doubt). In the current version of Article 66, UCMJ (2024 *MCM*), Congress has expressly retained CCA factual sufficiency review, albeit in a modified form. In the absence of clearer guidance, we infer Congress intended the beyond reasonable doubt standard to continue to apply in questions of factual sufficiency.

However, we also recognize Congress has overlaid the requirement that the CCA be "clearly convinced" the evidence is insufficient before granting relief. In this context, the term "clearly convinced" is capable of an unambiguous plain-language interpretation—independent of legal terms of art—consonant with a coherent and consistent statutory scheme that does not lead to absurd results. *See Robinson*, 519 U.S. at 340; *Cabuhat*, 83 M.J. at 766. Accordingly, in order to set aside a finding of guilty, we must not only find the weight of the evidence does not support the conviction; we must be clearly convinced this is the case. Put another way, in order to set aside a finding of guilty we must be clearly convinced that the weight of the evidence does not support the conviction beyond a reasonable doubt.

Cognizant that the Government may prove its case by circumstantial evidence, and giving appropriate deference to the fact that the military judge saw and heard the testimony and other evidence, we are not clearly convinced the military judge's findings of guilty were against the weight of the evidence. Accordingly, we find the findings of guilty as to the Charge and Specification factually sufficient.

**B. Ruling on Motion to Dismiss**

**1. Additional Background**

The Air Force Judge Advocate General (TJAG) designated Captain (Capt) CP an Air Force judge advocate in September 2020. Capt CP was assigned to Malmstrom AFB as an assistant staff judge advocate. On 29 November 2021, Capt CP administered the oath to Appellant's squadron commander, Lieutenant Colonel (Lt Col) P, when Lt Col P preferred the Charge and its three specifications against Appellant. Capt CP subsequently represented the Government at the preliminary hearing pursuant to Article 32, UCMJ, 10 U.S.C. § 832, held on 19 January 2022.

In early March 2022, the Malmstrom AFB staff judge advocate became aware that Capt CP's license to practice law had been suspended by his state bar on 15 March 2021. Capt CP was removed from performing legal duties, but his designation as a judge advocate was not removed and he remained on active duty at the time of Appellant's trial.

On 21 July 2022, at the outset of Appellant's court-martial, the Defense submitted a motion to dismiss the Charge and specifications for a defective preferral and defective preliminary hearing. The Defense contended an attorney "must be both qualified and designated" as a judge advocate in order to perform judge advocate functions, and when Capt CP had lost his standing to practice law in March 2021 he was no longer qualified to serve as a judge advocate. Therefore, the Defense reasoned, Capt CP was not eligible to administer the oath to Lt Col P in November 2021, nor to represent the Government at the preliminary hearing in January 2022, and the Charge and specifications should be dismissed. In response, the Government contended that because Capt CP's designation as a judge advocate had not been withdrawn, he remained eligible both to administer the oath to Lt Col P and to represent the Government at the preliminary hearing.

After conducting a hearing, the military judge issued a written ruling denying the Defense's motion to dismiss. The military judge explained that although Capt CP may "be subject to other disciplinary consequences," the suspension of his license did not "automatically strip him of his status as a 'judge advocate' for purposes of the UCMJ." Because Capt CP's designation as a judge advocate had not been removed, the Defense had failed to demonstrate a defect with either the preferral or preliminary hearing.

**2. Law**

Both parties assert this court reviews a military judge's ruling on a motion to dismiss for an abuse of discretion, citing *United States v. Douglas*, No. ACM 38935, 2017 CCA LEXIS 407, at *19 (A.F. Ct. Crim. App. 15 Jun. 2017) (unpub. op.) (citing *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004)). *See also*

*United States v. Floyd*, 82 M.J. 821, 828 (N.M. Ct. Crim. App. 2022) ("We review a military judge's ruling to dismiss charges and specifications for an abuse of discretion." (Citing *Gore*, 60 M.J. at 187)). "An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact." *United States v. Smith*, 83 M.J. 350, 355 (C.A.A.F. 2023) (quoting *United States v. Donaldson*, 58 M.J. 477, 482 (C.A.A.F. 2003)), *cert. denied*, 144 S. Ct. 696 (2024).

Charges and specifications "shall be preferred by presentment in writing, signed under oath before a commissioned officer of the armed forces who is authorized to administer oaths." 10 U.S.C. § 830(a)(2); *see also* R.C.M. 307(b)(1) ("The person preferring the charges and specifications must sign them under oath before a commissioned officer of the armed forces authorized to administer oaths."). Officers authorized to administer oaths for military justice purposes include, *inter alia*, "[a]ll judge advocates" and "[a]ll . . . assistant staff judge advocates and legal officers." 10 U.S.C. §§ 936(a)(1), (5).

"A judge advocate, not the accuser, shall serve as counsel to represent the Government" at the preliminary hearing held pursuant to Article 32, UCMJ. R.C.M. 405(d)(2).

"The term 'judge advocate' means . . . an officer of the Judge Advocate General's Corps of the . . . Air Force." 10 U.S.C. § 801(13)(A). "Judge advocate functions in the Air Force and the Space Force shall be performed by commissioned officers of the Air Force who are qualified under regulations prescribed by the Secretary, and who are designated as judge advocates." 10 U.S.C. § 9063(g).

"Only TJAG is authorized to designate [Regular Air Force] . . . officers as judge advocates and remove that designation." Air Force Instruction (AFI) 51-101, *The Air Force Judge Advocate General's Corps (AFJAGC) Operations, Accessions, and Professional Development*, ¶ 6.2.1 (29 Nov. 2018).

> To be designated as a judge advocate, officers must . . . [b]e a graduate of a law school that was accredited or provisionally accredited by the American Bar Association at the time of graduation; and . . . [b]e in active (or equivalent) status, in good standing, and admitted to practice before the highest court of a United States (US) state, commonwealth or territory, or the District of Columbia.

*Id*. at ¶¶ 6.2.2, 6.2.2.1, 6.2.2.2. "Once designated, a judge advocate must maintain current eligibility to actively practice law before the highest court of the jurisdiction where they are licensed." *Id*. at ¶ 6.3.1.

A judge advocate's designation or certification or both may be withdrawn for good cause, including *inter alia* "fail[ure] to maintain professional licensing standards." *Id*. at ¶¶ 7.3, 7.3.1. A staff judge advocate or other AFJAGC

14

supervisor "submit[s] recommendations to withdraw a judge advocate's designation, certification, or both through judge advocate supervisory channels to [TJAG]." *Id.* at ¶ 7.5.

> When TJAG receives a recommendation or has sufficient basis to consider withdrawal, the judge advocate is notified of the proposed action and is afforded an opportunity to present information to show cause why the action should not be taken. The judge advocate will be given at least three duty days to respond. TJAG makes the final decision on withdrawal of designation or certification.

*Id.* "An officer whose designation has been withdrawn is not authorized to perform the duties of a judge advocate . . . unless authorized by TJAG." *Id.* at ¶ 7.6.

### 3. Analysis

Appellant's argument on appeal is substantially similar to the one he made at trial. The essential facts are not in dispute. Appellant acknowledges that at the time Capt CP administered the oath to Lt Col P and then served as the Government representative at the preliminary hearing, TJAG had not withdrawn Capt CP's designation as a judge advocate. Nevertheless, Appellant asserts that because Capt CP failed to maintain an active license to practice law, after 15 March 2021 he was no longer "qualified" to be a judge advocate and could not legitimately perform judge advocate functions. Therefore, he reasons, both the preferral of the Charge and specifications and the preliminary hearing were defective, and this court should set aside the findings of guilty and the sentence.

However, we agree with the military judge's conclusion. Although Capt CP evidently put his status as a judge advocate at risk by failing to maintain an active law license, the withdrawal of his designation as a judge advocate was not an automatic consequence of the suspension. The applicable regulation provides a process whereby a judge advocate's designation may be withdrawn for good cause, which culminates in TJAG making the final decision on the matter. Because TJAG had not withdrawn Capt CP's designation, he remained a judge advocate and therefore eligible to administer the oath at preferral and to represent the Government at the preliminary hearing.

## C. Prosecutorial Misconduct

### 1. Additional Background

As described in relation to the preceding issue, Capt CP was an assistant staff judge advocate at Malmstrom AFB who represented the Government at Appellant's preliminary hearing in January 2022, after his state bar suspended his law license in March 2021. During the hearing, Capt CP announced

he had "not acted in any way that might tend to disqualify [him]" from the hearing. In March 2022, Capt CP's staff judge advocate learned of the suspension.

**2. Law**

We review prosecutorial misconduct de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Prosecutorial misconduct occurs when trial counsel 'overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (alteration in original) (quoting *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, [for example] a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *Andrews*, 77 M.J. at 402 (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)). "[T]he prosecutorial misconduct inquiry is an objective one, requiring no showing of malicious intent on behalf of the prosecutor." *Hornback*, 73 M.J. at 160.

A judge advocate "shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ." AFI 51-110, *Professional Responsibility Program*, Atch 2, Rules 3.3(a), 3.3(a)(1) (11 Dec. 2018). "It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.* at Rule 8.4(c).

"A finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Article 59(a), UCMJ, 10 U.S.C. § 859(a). "In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Fletcher*, 62 M.J. at 184 (citation omitted).

**3. Analysis**

Appellant contends Capt CP engaged in prosecutorial misconduct when he asserted he had not acted in any way that would tend to disqualify him from participating in the preliminary hearing, approximately ten months after Capt CP's law license had been suspended.

The parties recognize this court addressed a substantially similar issue involving Capt CP in *United States v. Brissa*, No. ACM 40206, 2023 CCA LEXIS 97, at *13–17 (A.F. Ct. Crim. App. 27 Feb. 2023) (unpub. op.), *rev. denied*, 83 M.J. 388 (C.A.A.F. 2023). Capt CP served as assistant trial counsel at Brissa's court-martial in July 2021, approximately four months after the suspension took effect and eight months before his staff judge advocate learned of the

suspension. *Id.* at *2–5. Similar to the instant case, at Brissa's court-martial Capt CP announced he had not acted in any manner that *might tend* to disqualify him. *Id.* at *13. We noted that this was "evidently not true" because by failing to maintain his license Capt CP subjected himself to potential withdrawal of his designation as a judge advocate. *Id.* We acknowledged the record was unclear whether, at the time of the court-martial, Capt CP knew his license had been suspended, but we assumed for purposes of analysis the appellant had demonstrated prosecutorial misconduct. *Id.* at *14. However, we found the appellant could not demonstrate prejudice because, *inter alia*, the Government was also represented by a fully qualified senior trial counsel, the appellant had pleaded guilty, and on appeal he alleged no other error at his court-martial.

Similar to our approach in *Brissa*, in the instant case we assume for purposes of analysis that Appellant has demonstrated prosecutorial misconduct on Capt CP's part when Capt CP asserted he had not acted in any manner that might tend to disqualify him in the preliminary hearing. However, as in *Brissa*, we find Appellant has not demonstrated material prejudice to his substantial rights. Appellant attempts to distinguish *Brissa* on the basis that there, the Government was also represented by a senior trial counsel, whereas Capt CP was the sole Government representative at Appellant's preliminary hearing. We are not persuaded. Appellant fails to identify any manner in which Capt CP's participation resulted in substantial errors at the preliminary hearing, much less compromised the fairness and integrity of Appellant's court-martial where Capt CP did not participate at all. Accordingly, we find Appellant has not demonstrated he is entitled to relief.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred.[7] Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

---

[7] We note that Preliminary Hearing Officer Exhibit 9—the sealed portion of the audio recording of the preliminary hearing—is not attached to the preliminary hearing report, which is required to be attached to the record of trial for appellate review. R.C.M. 1112(f)(1)(A). Appellant has not raised the omission as an issue nor alleged it resulted in material prejudice to his substantial rights, and we find no such prejudice. *See* 10 U.S.C. § 859(a).

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court